# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**
## NO. 02-14-00376-CV


IN THE INTEREST OF K.M. A/K/A
K.V., A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98593J-13

----------

## MEMORANDUM OPINION[1]

----------

D.V. (Mother) appeals the trial court's order terminating her parental rights to her daughter K.M.[2]  We affirm the trial court's judgment.  *See* Tex. R. App. P. 43.2(a).

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

## I. BACKGROUND

Mother had one child, K.M., who was born on March 18, 2010. Mother's husband, A.M., was physically abusive to Mother, sometimes in K.M.'s presence.[3] During one domestic-violence incident, A.M. slapped K.M. across the face because she was crying, causing K.M.'s nose to bleed. Because of this violence, the Texas Department of Family and Protective Services (DFPS) entered into a safety plan with Mother on May 31, 2013 while Mother was living with K.M. at a shelter.

On June 9, 2013, Mother was arrested for public intoxication while K.M. was in her care, and DFPS immediately took possession of K.M. *See* Tex. Fam. Code Ann. § 262.104 (West 2014). The next day, DFPS filed a suit affecting the parent-child relationship (the SAPCR), requesting appointment as K.M.'s temporary managing conservator and termination of Mother's parental rights if reunification was not possible. *See id.* § 262.105 (West 2014). On June 27, 2013, DFPS entered into a family-service plan with Mother under which Mother agreed to attend parenting classes, maintain employment and housing, submit to random drug tests, attend individual counseling, and attend NA/AA meetings. *See id.* §§ 263.101–.102 (West 2014). On December 19, 2013, the trial court approved the family-service plan and set DFPS's SAPCR for trial. *See id.* §§ 263.106, 263.304 (West 2014). On May 12, 2014, DFPS filed a motion for

---

[3]A.M. was not K.M.'s biological father.

extension of the dismissal date supported by an affidavit of a DFPS employee. The employee described the need to locate Mother, administer a drug test, and give Mother additional time to complete her services. The trial court granted the motion and set the trial for October 13, 2014.

In December 2013, Mother began seeing Vanessa Moreno-Luper for counseling. Mother arrived late to her appointment with Moreno-Luper on March 11, 2014, and behaved "inappropriately in comparison with her regular demeanor." Moreno-Luper ordered a urinalysis test and discussed the results with Mother, who denied illegal drug use. At their March 24 session, Mother admitted to using cocaine before her last session, claiming the drugs were supplied by a co-worker and that she only had used once. Mother again tested positive for cocaine at her April 17 session with Moreno-Luper. Mother did not attend any sessions with Moreno-Luper in May but on June 4, she reported that she no longer associated with the co-worker who previously had supplied the drugs and that she had not used cocaine since before her April 17 positive test. On June 24, Mother revised her drug-use admissions to Moreno-Luper by acknowledging that her cocaine use began when she was drinking in a bar in February 2014 and met a group of females who offered her cocaine. "She reported she began indulging in at least two bags of cocaine during her weekend binge, claiming last use was the end of May, 2014." Mother also admitted to continued drinking until June 2014. Mother had negative urinalysis drug tests in June, July, and August 2014.

While attending her sessions with Moreno-Luper, Mother reported that she was living with an emotionally abusive employer. Upon leaving that housing situation, Mother moved in with a roommate who had a pending DFPS case because his teenage son had stolen items to pay for his drug habit. Mother later reported that she began living on her own a few months before August 2014.

Moreno-Luper discharged Mother from counseling in August 2014 because she had successfully completed the treatment goals. At the time of the discharge, Moreno-Luper reported that Mother had approximately three months of "clean time" from drug and alcohol abuse. Mother did not have and had not had an AA sponsor, although she did attend AA meetings. Moreno-Luper concluded that Mother suffered from addiction that led to dishonest statements concerning her drug and alcohol use and other matters. She opined that three months of "clean time," while commendable, were insufficient to prove an ability to parent a child, and she "recommend[ed] more sobriety time as far as [Mother] going through the steps and working towards her sobriety."

Katherine Manigrasso, the DFPS conservatorship worker assigned to K.M.'s case, noted that Mother maintained employment, kept in contact with K.M., and completed the required services. However, Manigrasso discovered that Mother was using cocaine from March through May of 2014. Although Mother first told Manigrasso she used one baggie of cocaine per week on Saturdays, she later admitted to using as many as five baggies of cocaine a day. Mother took four hair-strand tests in 2014—on April 28, May 15, September 4,

4

and September 29.  The levels of cocaine in Mother's system, based on those hair-strand results, were much higher in April and May than in September, but actually rose from the September 4 test to the September 29 test.  In October 2014, Mother admitted to Manigrasso that she was dating a man she met at an AA meeting who was a recovering cocaine addict.  Manigrasso testified that she spoke to Mother on the day of trial at the courthouse and that Mother told her if "she were to lose custody of [K.M.], that she would go home and kill herself."

At the October 2014 bench trial, Mother testified and admitted that she had been using drugs but that she had stopped in June or July 2014.  She also admitted that she allowed K.M. to remain in a violent situation while she was married to A.M.  Mother tried to hide her relationship with the boyfriend she met at AA, whom she started dating in late 2013, because she knew it would hurt her chances of reunification with K.M.  Two months after being discharged from treatment, Mother testified that she had an AA sponsor who she had been talking to for five months and that she was on step twelve of her recovery.  She also denied she had an addictive personality or a drug or alcohol problem.

K.M.'s foster mother, E.F., testified that K.M. was doing well in foster care and that K.M. was scared of "going back to her mom."  E.F. stated that she and her husband, F.F., wanted to adopt K.M. if Mother's parental rights were terminated.  Manigrasso testified that it would be in K.M.'s best interest to terminate Mother's parental rights:

5

Since this case has been open, . . . for about a year and a half, she has had all this time to address her addiction. And while her young daughter was in foster care, she was continuing to abuse cocaine and deny it. And the fact that she's still denying it even though we have two positive results . . . demonstrates that she has not accepted her addiction, which is one of the first steps in the 12-step program that she has told me she has completed.

The trial court found by clear and convincing evidence that Mother knowingly placed or knowingly allowed K.M. to remain in conditions or surroundings that endangered the physical or emotional well-being of K.M. and engaged in conduct or knowingly placed K.M. with persons who engaged in conduct that endangered the physical or emotional well-being of K.M. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West 2014); *see also id.* §161.206 (West 2014). The trial court also found that termination of Mother's parental rights was in K.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2).[4] The trial court appointed DFPS as K.M.'s managing conservator. *See id.* § 161.207 (West 2014).

Mother did not file a motion for new trial. Mother now appeals and argues that the evidence was legally and factually insufficient to support the trial court's endangerment findings and that termination was in the best interest of K.M. *See In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.) (en banc) (in an appeal from a termination trial had to the bench, holding

---

[4]The trial court terminated the parental rights of K.M.'s biological father, H.A. *See* Tex. Fam. Code Ann. § 161.002 (West 2014). H.A. has not appealed the termination.

6

sufficiency points may be raised for the first time on appeal under Tex. R. App. P. 33.1(d)).

## II. LEGAL CONSIDERATIONS IN PARENTAL-TERMINATION CASES

We strictly scrutinize termination proceedings and construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Parental rights, although constitutional in dimension, are not absolute. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014). "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Therefore, to justify termination of a parent-child relationship, DFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803. Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## III. DISCUSSION

### A. STANDARD AND SCOPE OF REVIEW

We need not exhaustively detail the relevant evidence supporting the termination decision if we are affirming the fact-finder's decision. *A.B.*, 437 S.W.3d at 500. In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment and resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the fact-finder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated subsection (1)(D) or (1)(E) of section 161.001 and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

### B. SECTION 161.001(1): PROHIBITED ACTIONS

In issues one and two, Mother challenges the legal and factual sufficiency of the evidence to support each section-161.001(1) ground alleged by DFPS and found by the trial court. Here, the trial court concluded that clear and convincing

8

evidence supported two of section 161.001(1)'s prohibited actions: (1)(D) and (1)(E). We need only conclude that one of the prohibited actions listed in section 161.001(1) was supported by sufficient evidence. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In her second issue, Mother asserts that the evidence was legally and factually insufficient to support the finding that she engaged in conduct or knowingly placed K.M. with persons who engaged in conduct that endangered K.M.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Mother focuses her argument on the facts that A.M.'s abuse was "a one-time incident" and that she had stopped using cocaine at the time of trial. Mother told a DFPS investigator, however, that A.M.'s abuse began while she and A.M. lived in Mexico and continued when she moved to Texas with A.M. and K.M. Mother testified that A.M. was violent toward her three times—in October 2012, December 2012, and April 2013 when he slapped K.M., causing her nose to bleed—and that A.M. began pushing and hitting her in K.M.'s presence in 2012. Despite the police being called to the scene, Mother admitted she insisted the officer not take A.M. to jail. Mother continued to subject K.M. to exposure to domestic violence.

In December 2012, Mother was arrested for assault with bodily injury to a family member after getting drunk and kicking out the windows of A.M.'s house. While the police were at the scene, they found K.M., who was not yet three-years

old, "headed toward the road on her own," unsupervised. When the police told A.M. to take K.M. back into the house, Mother admittedly "punched" A.M.

After Mother left A.M., she was arrested for public intoxication while supervising K.M., leading to K.M.'s removal.[5] Mother told Moreno-Luper that she had a problem with alcohol. After K.M. was removed, Mother began using cocaine, using as much as five baggies in one day. She also continued to abuse alcohol. Although Mother admitted to the cocaine use after her initial denials, she was not truthful about the extent of her usage, as shown by her drug tests. Mother tested positive for drugs multiple times during the pendency of the termination proceeding, and a test given the month before the termination trial showed a rising level of cocaine in Mother's system. Mother also admitted to hiding her relationship with her boyfriend, who was a recovering cocaine addict, because she knew it would "damage the case." Both Moreno-Luper and Manigrasso testified that they were concerned about Mother's ability to parent based on the domestic violence K.M. was raised in and Mother's continued drug abuse.

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re*

_____

[5]In this incident, Mother was so intoxicated that she fell to the ground while holding K.M. and passed out.

10

*J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination must be based on more than a single act or omission, and there must be a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013) (en banc op. on reh'g), *aff'd*, 437 S.W.3d 498 (Tex. 2014). "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.).

We conclude that the evidence was legally and factually sufficient to allow the trial court as fact-finder to determine that Mother endangered K.M. based on the repeated domestic-violence incidents at which K.M. was present and, in one instance, unsupervised; Mother's drug abuse; and Mother's arrests for domestic violence and public intoxication in K.M.'s presence. *See In re S.R.*, Nos. 14-14-

00393-CV & 14-14-00416-CV, 2014 WL 5898453, at *6–11 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, no pet. h.) (holding evidence of parent's criminal convictions, drug use, history of domestic violence in presence of children, and noncompliance with service plan legally and factually sufficient to support termination under section 161.001(1)(D) or (E)); *In re T.A.D.*, 397 S.W.3d 835, 839–40 (Tex. App.—Dallas 2013, no pet.) (concluding evidence that parent abused drugs and alcohol, was arrested for public intoxication, was dismissed from assistance program, and was involved in family violence sufficient to support termination on endangerment grounds); *In re C.J.S.*, 383 S.W.3d 682, 689–90 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (finding sufficient evidence of endangerment under section 161.001(1)(E) with evidence of parent's positive drug tests, poor judgment, and lack of impulse control); *In re J.T.G.*, 121 S.W.3d at 131 (holding evidence legally sufficient to support endangerment findings because parent had history of domestic violence, drug abuse, and criminal conduct). We overrule issue two.

## C. SECTION 161.001(2): BEST INTEREST

In her third issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of K.M. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But prompt and permanent placement of the

12

child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection-(1) ground and the best-interest determination. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)　the desires of the child;

(B)　the emotional and physical needs of the child now and in the future;

(C)　the emotional and physical danger to the child now and in the future;

(D)　the parental abilities of the individuals seeking custody;

(E)　the programs available to assist these individuals to promote the best interest of the child;

(F)　the plans for the child by these individuals or by the agency seeking custody;

(G)　the stability of the home or proposed placement;

(H)　the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)　any excuse for the acts or omissions of the parent.

*E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"). These

13

factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

The evidence at trial showed that K.M. was scared of being returned to Mother and that she was "happy" being with E.F. and F.F. K.M. did not like talking to Mother on the phone and strongly resisted having to visit Mother, throwing herself to the ground when told she had to go. She refers to E.F. and F.F. as her "mom" and "father." Since being with E.F. and F.F., K.M. has changed for the better. When she first was placed with E.F. and F.F., K.M. was frightened of F.F. and asked E.F. if he ever hit her. K.M. had vivid memories of her time with Mother: "She has told [E.F. and F.F.] stories . . . of hiding from the police, events of seeing a lot of blood, a lot of yelling, a lot of hitting . . . . She has told some stories about using knives and cutting, exposing a lot of blood in arms or legs." E.F. and F.F. planned to adopt K.M.

As explained above, Mother had a history of alcohol abuse and she continued to use drugs and alcohol after her child's removal. Despite being given additional time to address her substance-abuse problem, Mother continued to show positive results on drug tests up to the month before trial and continued to deny any problem despite her claims to have completed the twelve steps of AA. Further, as detailed above, Mother had exposed K.M. to violence and

14

neglect which had left the child with fear and emotional issues that Mother did not have the insight or skills to understand or deal with. Manigrasso's testimony that on the day of trial Mother stated an intent to kill herself if she lost custody of her child demonstrates the instability of Mother and her inability to provide a positive home environment.

Considering the relevant factors, we hold that in light of the entire record and giving due consideration to evidence that the trial court reasonably could have found to be clear and convincing, the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in K.M.'s best interest. *See In re Z.C.*, 280 S.W.3d 470, 475 (Tex. App.—Fort Worth 2009, pet. denied) (holding "stability and permanence" found in foster care and children's improving condition sufficient to support best-interest finding); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (considering children's stated desire to remain with foster family supportive of best-interest determination); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). We overrule issue three.

## IV. CONCLUSION

Because legally and factually sufficient evidence supported the trial court's conclusions that Mother violated section 161.001(1)(E) and that termination was

in K.M.'s best interest under section 161.001(2), we overrule issues two and three.  Because we overrule issue two, we need not address issue one.  *See* Tex. R. App. P. 47.1; *A.V.*, 113 S.W.3d at 362.  We therefore affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  March 19, 2915